## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL TEPPER, individually and on behalf of all others similarly situated,<br><br>                           Plaintiff,<br><br>   v.<br><br>VESYNC CORPORATION,<br><br>                        Defendant. | Civil Action No.<br><br>**CLASS-ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Daniel Tepper ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Vesync Corporation ("Defendant" or "Vesync"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### <u>NATURE OF THE ACTION</u>

1. This is an action arising from the false and misleading representations that Defendant made for years about its Levoit-brand EverestAir Smart True HEPA, Core 300, Core 300-RAC, Core P350, and Core 300S True HEPA air purifiers (the "Air Purifiers"), along with their respective replacement filters (collectively, the "Products").

2. Specifically, Defendant represented that the Air Purifiers were equipped with High Efficiency Particulate Air (HEPA) and H13 filters when in fact they were not. Defendant also represented that the replacement filters it sells for the Air Purifiers were "H13 True HEPA" filters, when in fact they were not.

3. Independent testing by Plaintiff's counsel, and testing commissioned by Dyson, Inc. ("Dyson") as part of a challenge brought through the National Advertising Division of the

Better Business Bureau (NAD), has shown that the replacement filters and the filters inside the Products do not meet HEPA standards.

4.      Reasonable consumers have had no opportunity to find this out for themselves because they cannot conduct HEPA standard testing.

5.      Defendant knew this but continued hocking its wares, making a killing selling the Air Purifiers *and* replacement filters since the outset of the COVID-19 pandemic.  Defendant claims on its Products' packaging that it is the "#1 Best Selling Air Purifier Brand in the US." There is good reason to believe Defendant, as its Air Purifiers do millions of dollars a month in sales on Amazon.com alone.

6.      In response to the NAD challenge brought by Dyson, Vesync agreed to remove its false and misleading representations about the Products' filters from the Product pages and packaging of its Products.  However, this attempt at remediation is a day late and a dollar short. Defendant has profited greatly from the explosion in the air-purifier market brought about by the ongoing COVID-19 pandemic and yearly "once-in-a-lifetime" wildfires that have ravaged the United States.  Consumers are rightfully concerned about maintaining indoor spaces that are free of harmful pathogens and contaminants.  As a result, a large portion of Defendant's gargantuan profits are attributable to the HEPA filtration claims that it falsely made about its Products.

7.      But for Defendant's HEPA claims, the fair value of its Levoit Air Purifiers would have been substantially lower, *i.e.*, their market price would have been closer to non-HEPA filters, which sell at a discount compared to air purifiers with HEPA filters. Put differently, Defendant's HEPA misrepresentations allowed it to overcharge the class in the amount of the HEPA-related price premium—even assuming there would be a market for Defendant's non-HEPA filters at all.

8.      Relatedly, Defendant's false and misleading representations induced reasonable consumers like Plaintiff into purchasing the Products.  Had Plaintiff and all other similarly situated

consumers known that—contrary to Defendant's knowing representations—the Products did not have HEPA filters, they would have paid less for the Products or not purchased them at all.

9.     Defendant appreciates the importance of truthfully representing compliance with HEPA standards as it has initiated business to business proceedings against competitors for false advertising of HEPA compliance through NAD.

10.    Plaintiff is now seeking a return of the HEPA-related premiums that Defendant charged for its Products, on behalf of himself and other similarly situated purchasers. Plaintiff asserts claims on behalf of himself and all other similarly situated purchasers of Defendant's Products for: (i) violation of New York's Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law ("GBL") § 349; (ii) violation of New York's False Advertising Law, N.Y. GBL § 350; (iii) fraud; (iv) unjust enrichment; and (v) breach of express warranty.

## PARTIES

11.    Plaintiff Daniel Tepper is a citizen of New York and resides in Westchester County, New York.  While in New York, Plaintiff Tepper purchased a Levoit Core 300 True HEPA Filter Air Purifier from Amazon.com on March 3, 2022 for $89.98.  Plaintiff also purchased a Levoit Core P350 True HEPA Filter Air Purifier from Amazon.com on July 11, 2023 for $119.99. Plaintiff also purchased two Levoit Core 300-RAC True HEPA Air Purifiers ($79.99 each) from Macys.com on November 9, 2023.   Plaintiff Tepper reviewed and relied on Defendant's warranties and representations about the Product's HEPA filter and filtration capabilities prior to purchasing the Products.  Specifically, Plaintiff saw on the Amazon and Macy's websites that Defendant's filters were advertised as HEPA grade and that "HEPA" was incorporated into the product's title.  The packaging pictured on the websites states on the box "True HEPA Air Purifier."   He also read reviews regarding same on those websites which were based on Defendant's representations.  Plaintiff Tepper reasonably relied on Defendant's representations

and believed that the Air Purifiers had HEPA filters. Had Defendant not warranted and represented that the Products had HEPA filters, Plaintiff Tepper would not have purchased the Products or would have paid substantially less for them.

12. Defendant Vesync Corporation is a California corporation with headquarters in Anaheim, California.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed classes; (b) some members of the proposed classes have a different citizenship from the Defendant and the Defendant is a citizen of California whereas Plaintiff is a citizen of New York; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

14. This Court has personal jurisdiction over Defendant because Defendant conducts and transacts significant business in the State of New York, contracts to supply goods within the State of New York, and supplies goods within the State of New York.

15. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant transacts significant business within this District; Plaintiff resides within this District as do many class members; and a substantial part of the events giving rise to Plaintiff's and class members' claims took place within this District.

## FACTUAL ALLEGATIONS

**A.    Air Purifiers and the Air-Purifier Market**

16.    The Environmental Protection Agency (EPA) estimates that "about 67 million tons of pollution were emitted into the atmosphere in the United States" in 2021 alone.  This pollution comes at great cost to human health: "[p]oor air quality is responsible for an estimated 100,000 premature deaths in the United States each year."  Exposure to air particulates has also been linked to symptoms of depression, cognitive decline, and increased feelings of anxiety.

17.    Air pollution can also be a visceral reminder of human-driven climate change: the smoke from wildfires that have raged across both coasts of the United States since 2020 has quite literally blocked out the sun and forced millions of people indoors.  For many, the smoke has exacerbated health conditions such as asthma or emphysema.

18.    As a result, public concern about air pollution is high.  In fact, one 2019 survey found that, of about 1000 responses, 43% of respondents indicated that they had a "great deal" of concern about air pollution in the United States and 31% indicated that they had a "fair amount" of concern about air pollution.  Taken together, 74% of respondents expressed concern about air pollution.  This is in line with the EPA's concerns—the agency places indoor air pollution among the top five environmental health risks.

19.    Concern about air quality skyrocketed in 2020, however, as wildfires intensified and the airborne COVID-19 virus shut down the globe.

20.    As expected, consumer concern over airborne contaminants has helped the air-purifier market explode, from $8.05 billion in 2019 to $16.83 billion in 2024:[1] "the COVID-19 pandemic has increased the demand for air purifiers, with the growing awareness of COVID-19 associated respiratory ailments and the rising need to curb cross-contamination.  Factors such as

---

[1] Research and Markets, *Air Purifier Market – Growth, Trends, COVID-19 Impact, and Forecasts (2022–2027)*,                    WWW.RESEARCHANDMARKETS.COM, https://www.researchandmarkets.com/reports/4987153/air-purifier-market-growth-trends-covid-19 (last visited September 3, 2024).

increasing airborne diseases and growing health consciousness among consumers are driving the market."

21.    Air purifiers come in various forms.  Among the most effective purifiers are those with HEPA filters.  HEPA is an acronym for "High Efficiency Particulate Air."  HEPA filters are strictly designed and must adhere to certain specifications to be designated as HEPA.

22.    Specifically, a HEPA filter is a type of pleated mechanical filter that typically consists of sheets of randomly arranged fiberglass or plastic fibers held in an accordion shape by aluminum separators. To be called a HEPA filter, the filter must capture at least 99.97% of all dust, pollen, mold, bacteria, etc., whose size is equal to the "most penetrating particle size" (MPPS). The MPPS is the size at which a particle is most likely to pass through a filter, i.e., these are the hardest particles to trap. This in turn means that HEPA filters are more likely to capture particles that are larger or smaller than the MPPS, i.e., by definition, HEPA filters capture more than 99.97% of non-MPPS particles. For ease of reference, the MPPS is typically described as 0.3 microns, but that size can vary by test, and it can include a range of particle sizes. For example, under certain tests—and in order to meet the HEPA standard—a purifier must be able to filter at least 99.97% of particles that are 0.1–0.3 microns in diameter (in other words, if a filter captures 99.97% of particles at 0.3 microns, but does not reach 99.97% at 0.2 microns, then the filter would not qualify as HEPA).



**Figure 1:** *A Graphic Example of a HEPA Filter*

23.     According to the Centers for Disease Control and Prevention (CDC), HEPA filters "are the most efficient filters on the market for trapping particles that people exhale when breathing, talking, singing, coughing, and sneezing."[2]

24.     For example, even though the SARS-CoV-2 virus is about 0.125 microns in diameter, the CDC has stated that "air purifiers can help reduce airborne contaminants, including viruses, in a home or confined space."[3]

25.     The reason why consumers may care that the air purifier they purchase meets the HEPA standard is self-evident.  It offers near certain protection against the transmission of airborne

---

[2] CENTER FOR DISEASE CONTROL AND PREVENTION, Improving Ventilation in Your Home,           https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/improving-ventilationhome (last accessed September 3, 2024).

[3] *Id.*

pathogens in the home (if the purifier is given enough time to circulate the air), and it can also filter out pollution caused from events like wildfires, which are growing ever more frequent.

26.    Consumers want the assurance that the HEPA standard provides, and they are willing to pay more for HEPA filters, *i.e.*, consumers are willing to pay a premium for filters that meet the HEPA standard. A review of current sales prices, across brands that sell both HEPA and non-HEPA filters (what marketers sometimes call "HEPA-type" purifiers), indicates that HEPA purifiers sell—on average—at a 41% premium to non-HEPA filters within the same brand:

TABLE A

| Model | HEPA | | | Non-HEPA | | | HEPA premium |
|---|---|---|---|---|---|---|---|
| | Price | Coverage | Price/sf | Price | Coverage | Price/sf | |
| Molekule | $1,015 | 1,000 sf | $1.02 | $600 | 1,000 sq/ft | $0.60 | 41% |
| Holme | $40 | 80 sf | $0.50 | $35 | 109 sq/ft | $0.32 | 36% |
| Crane | $90 | 250 sf | $0.36 | $61 | 300 sq/ft | $0.20 | 44% |
| Therapure | $180 | 200 sf | $0.90 | $180 | 343 sq/ft | $0.52 | 42% |
| Average premium: | | | | | | | 41% |

27.    Being able to make a "HEPA-filtration" claim is thus a huge boon for manufacturers, and they know it.  The HEPA standard claim is a signal to consumers that the product they are purchasing has been constructed to exacting standards and is able to provide superlative levels of filtration.

28.    Accordingly, the phrase "True HEPA" is now ubiquitous in air purifier marketing, including Defendant's.  The reason for this is that the phrase carries weight.  It is a signal of quality to consumers—that the air purifier they are buying is of a high grade and worth more than purifiers that do not have a HEPA filter.  Though consumers, including Plaintiff, may not know the filtration efficiency requirements of the HEPA standard, or the technicalities of the various HEPA-standard testing protocols, they recognize the HEPA acronym and are willing to pay more for air purifiers that have it in their marketing and labeling.  If having a HEPA filter was not material to consumers,

then manufacturers like Defendant would not advertise the feature so heavily, nor would Defendant bring HEPA false advertising disputes through NAD.  In fact, given consumer preference for HEPA filters, there are few, if any, non-HEPA filters left on the market, *i.e.*, there is little to no demand for filters that do not bear the HEPA designation.

29.     The materiality to consumers of HEPA representations is further confirmed by enforcement actions taken by regulators including the Federal Trade Commission, which has, among other things, entered into Consent Decrees with manufacturers of air purifiers for claims made about the efficacy of their HEPA purifiers and filters.  *See, e.g., In the Matter of Honeywell,* FTC File No. 962-3154.[4]

30.     The representation used by Defendant of "True HEPA" also carries greater significance to consumers: that there may be a "false" or inauthentic HEPA filter out there.  The use of the term "True HEPA" is thus an affirmation by manufacturers like Defendant that a HEPA is a standardized term with prescribed qualities.

31.     While Defendant makes a number of representations about the capabilities of its Products, "HEPA" and "True HEPA" are front and center.  Ultimately, Defendant knows that consumers are primarily driven to make their purchase based on the presence of "HEPA" in the Product's name or on the Product' s packaging.  Consumers would not have purchased or would have paid significantly less for Defendant's Products if the word HEPA was not present – even if all of the other marketing representations remained such as filtration efficiency figures.  Consumers value HEPA far more than any of the other marketing terms and technical information that Defendant provides.

**B.     Defendant's Products and Advertising**

---

[4] *Available at* https://www.ftc.gov/legal-library/browse/cases-proceedings/962-3154-honeywell-inc-matter.

32.    At issue in this action are the following models of air purifiers: the Levoit EverestAir Smart True HEPA air purifier, and the Levoit Core 300, Core 300-RAC, Core 300S, and Core P350 True HEPA ("Core Series") air-purifier line of products, along with their respective replacement filters.

33.    The EverestAir is a slab-shaped device that accepts a rectangular filter.  It retails for $499.99.  The Core Series purifiers are cylindrical devices that accept the same circular filter, i.e., the filter is interchangeable between them, and it forms the basis for the common HEPA claims. These cylindrical devices have some unique features between them (*e.g.*, the Core 300S may be controlled by an app), but they are substantially similar in performance, and they retail between $99.99 and $149.99.  Moreover, Plaintiff is informed and believes that Defendant applied HEPA test results from one filter to all of the Core 300 Series air purifiers.



**Figure 2:** *Levoit Everest Air and Core 300 Air Purifier and Core 300 Replacement Filter*

34.    Defendant crafted unique false and misleading HEPA representations for each of these Products.

35.    For instance, Defendant made the following express representations in the advertising for its EverestAir Air Purifier. These representations were made (among other places)

on its website (which has since been altered), in its advertising, and on the websites of online stores that sell these filters, such as Amazon (these webpages have also been altered):

    a) Levoit EverestAir® Smart True HEPA Air Purifier.

    b) To be considered True HEPA by US standards, the HEPA filter must trap at least 99.97% of 0.3-micron airborne particles. The EverestAir achieves this high standard of excellence, trapping fine dust, pollen, smoke particles, and pet dander, keeping your air as clean as possible.

    c) H13 True HEPA Filtration Traps at least 99.97% of 0.3-micron airborne particles.

    d) H13 True HEPA Filter with HEPASmartTM Technology Enhanced with statically charged fibers to trap at least 99.97% of 0.3-micron airborne particles, such as fine dust, smoke particles, pollen, and pet dander.

    e) H13 True HEPA Filter Captures 99.99% of Particles, Pet Allergies, Smoke, Dust, ANTI-ALLERGENS & ODORS: Premium 3-stage filtration includes a Washable Pre-Filter, H13 True HEPA Filter, and High-Efficiency Activated Carbon Filter. Trap at least 99.97% of 0.3-micron airborne particles, as well as odors, VOCs, fumes, and smoke.

    f) The EverestAir provides premium filtration, trapping at least 99.97% of 0.3-micron airborne particles.

    g) H13 True HEPA Filter with HEPASmart Technology. Enhanced with statically charged fibers to trap fine dust, smoke particles, pollen, and pet dander, as well as bacteria, mold, and viruses*. *Testing Report No. 220614240GZU-001.

36. As to the Core Series, Defendant made the following express representations. These representations were made (among other places) on its website (which has since been altered), in its advertising, and on the websites of online stores that sell these filters, such as Amazon (these webpages have also been altered). The following are examples of such false representations:

    a. Levoit Core 300 True HEPA Air Purifier. (Product package).

    b. Breathe in clean air with every breath using the Levoit Smart True HEPA Air Purifier. (Product page and Amazon page).

    c. [Includes a] H13 True HEPA Filter. (Product package and Amazon page).

d.  HEPASmart™ Technology helps capture 99.99% of bacteria and mold, as well as 99.9% of viruses*.  (Product package and Amazon page).

e.  Filters at least 99.97% of airborne particles 0.3 microns in size, including fine dust, pet dander, smoke, and pollen. (Product package and Amazon page).

f.  The H13 True HEPA Filter works alongside the Pre-Filter and High-Efficiency Activated Carbon Filter to capture 99.97% of airborne particles 0.3 microns in size, such as dust, smoke, pollen, odor. (Product webpage and amazon page).

g.  Filters at least 99.97% of 0.3-micron airborne particles.  (Product package and Amazon page).

h.  Levoit Core 300 True HEPA 3-Stage Original Filter.  (Product package and Amazon Page).

i.  Fill your environment with fresh, clean air using Levoit's Core 300-RF 3-Stage Original Filter. An effective 3-stage filtration system captures at least 99.97% of airborne particles 0.3 microns in size, so your surrounding air is free of harmful contaminants. (Product page and Amazon page).

37.    Throughout the class period, the packaging of the Core 300, 300S, and Core P350 also included false HEPA claims:






**Figure 3**

38.     The packaging for the EverestAir makes a similar claim:



**Figure 4**

39.     And so does the packaging for the replacement filter:



**Figure 5**

40.     Consumers interested in purchasing the EverestAir Purifier would encounter advertising such as this:



**Figure 6**

41.     Defendant has scrubbed the product pages for each of these Purifiers of any reference to HEPA—having apparently conceded to Dyson's NAD challenge rather than producing evidence to refute Dyson's claims. In fact, on July 23, 2023, Defendant removed the old product page for its Core 300 series Air Purifiers and uploaded a new one with a unique web address.[5]  The old webpage described the Core 300S as the "Levoit Core 300S Smart True HEPA Air Purifier."  The new webpage omits any and all reference to HEPA filtration.

---

[5] The product webpage changed from https://levoit.com/products/core-300s-smart-true-hepa-air-purifier to https://levoit.com/products/core-300s-smart-air-purifier.



**Figure 7:** *A Diagram of the Core 300 Filter from the Levoit Website Around August 2023*

42. The changes to representations made about the Products were not constrained to Defendant's website, either. Defendant has attempted to scrub reference to HEPA filtration from all online storefronts where the Air Purifiers are sold. However, this was only partially successful. Some webpages were missed entirely and in others there are still misleading references to HEPA filtration.

**C.     Defendant's Products Are Challenged And Fail To Meet HEPA Standards**

43. On August 4, 2023, the National Advertising Division released its "FINAL DECISION" on Case #7222, Dyson's challenge to Vesync's express and implied claims regarding the filtration capabilities of its EverestAir and Core 300, and Core 300S Smart True HEPA Air Purifiers and replacement filters. The decision is attached to this complaint as Exhibit A.

44. Dyson alleged that the filters and replacement filters for the Air Purifiers in question did not actually meet HEPA standards, despite Defendant's express and implied representations, detailed above.

45. In support of this, Dyson presented the following evidence:

    a.  the Institute of Environmental Science and Technology's ("IEST") Contamination Control Division's Recommended Practice CC001.6 (HEPA and ULPA Filters) and CC007.3 (Testing ULPA Filters), which Dyson argued are industry-recognized guides establishing the basic standards and definitions for HEPA-level filtration in the U.S.;

    b.  third-party testing conducted by SGS IBR Laboratories on the filters used in the Levoit EverestAir® Smart True HEPA and Core 300 and Core 300S True HEPA air purifiers, which demonstrated that the filters do not meet the IEST HEPA standards;

    c.  EN 1822-1 (High-Efficiency Air Filters (EPA, HEPA, and ULPA)), the European standard for performance classifications of air purification; and

    d.  U.S. Department of Energy Guidelines (DOE Technical Standard "Specification for HEPA Filters used by DOE Contractors").

Ex. A at 2.

46.    Defendant Vesync responded to Dyson's challenge by stating that "for reasons unrelated to Dyson's challenge, it had elected to permanently discontinue the challenged claims." *Id.* at 3.

47.    Despite Defendant's tacit admission of fault in the face of Dyson's testing, Plaintiff's counsel commissioned their own independent third-party testing of the Core 300 series replacement filter, attached to this complaint as Exhibit B.

48.    The lab chosen by Plaintiff's counsel is often used by companies to certify their filters and is an industry leader in the rigorous and accurate testing of HEPA filters. The lab is certified by ANAB/ANSI, a non-governmental organization that provides accreditation services and training to public and private-sector organizations. Moreover, the lab is well known for its stringent adherence to the various HEPA testing protocols set forth by the European Union, the International Standards Organization, and the United States. The lab is capable of testing filters with efficiencies up to 99.9999% filtration.

49.    Defendant claimed that its filters could filter out 99.97% of particles. The lab is more than sufficiently equipped to test such a claim.

50.     Just as Dyson had found before, testing by the lab commissioned by Plaintiff's counsel found that Defendant's Products were not truly HEPA-grade.

51.     The testing was conducted in accordance with European and American testing protocols.  In America the protocol used to establish HEPA-grade is IEST-RP-CC001.7.  In Europe the protocol used to establish claims at or above HEPA-grade (*e.g.*, 99.99% removal at .003 microns as claimed by Defendant) is the EN1822 test.  Both protocols test for a filter's ability to filter out fine particles, but they employ differing testing methodologies and naming conventions.

52.     The results of the EN1822 test are used to group filters into one of three classes: Efficient Particulate Air Filters (EPA), High Efficiency Particulate Air Filters (HEPA), and Ultra Low Penetration Air Filters (ULPA).  For purposes of the test, efficiency is defined as the filtration efficiency against the "most penetrating particle size."  Each class has subdivisions as well, depending on the filter's efficiency.  Thus, a filter tested under the EN1822 standard which could filter between 85% and 95% of particles at the most penetrating size would be classified as an EPA 10, or "E10" filter.  A filter which captures the most penetrating particles at a rate of 99.999995% would be categorized as a ULPA 17, or "U17" filter.  HEPA filters can be H13 (99.95%) or H14 (99.995%) before bumping up to the U15 class (99.9995% efficiency).

53.     For the American IEST protocol, to be classified as a HEPA filter, the filter must have a filtration efficiency of at least 99.97%.  Particles ranging in size from 0.1 microns to 5.0 microns are used in the test.  The test is done over eight stages, with each stage measuring the filtration efficiency for a subset of particle sizes.  The filter must specifically have a filtration efficacy of at least 99.97% for microns of <u>all sizes</u> between 0.1-0.3 microns.

54.     When Defendant's filter was tested under the EN1822 standard, the Product's filtration efficiency resulted in a grade of E11, the second lowest grade.  The test conclusively demonstrated that Defendant's H13 HEPA claim is false.

55.     The Products fared no better under the IEST-RP-CC001.7 standard.    The test conclusively demonstrated that Defendant' HEPA claim is false.

56.     Between the EN1822 and IEST testing commissioned by Plaintiff, all of the express HEPA representations set forth in paragraph 36 were proven to be false.    Specifically, because the test results show that measurements at above or below 0.3 microns were under 99.97%, it is necessarily true that any measurement at 0.3 microns exactly would also fall under 99.97%.    *See supra,* ¶ 22.

57.     In a substantially identical case Defendant has admitted in filings that it tests its Products in accordance with the IEST-RP-CC001.7 standard.    Thus, Defendant's HEPA representations to consumers are necessarily grounded in adherence to the IEST standards.

58.     Plaintiff is informed and believes that Defendant knew through its own testing—under IEST and EN1822 standards, which were in place at all times during the class period—that its Products were being falsely advertised as having HEPA filters because the Products failed to meet the filtration efficiency requirements of the standards.

59.     Throughout the class period, Defendant made repeated express representations on the Product's packaging and in its marketing (including in-store and on Amazon and other websites carrying the Products) that the Products included a HEPA-grade filter that even exceeded the HEPA standard.    Plaintiff's testing proves otherwise.    Defendant's advertising is thus false and highly misleading to consumers like Plaintiff and the members of the Classes he seeks to represent.

**D.    But for Defendant's HEPA Misrepresentations, Plaintiff and the proposed Classes would have paid less for their Air Purifiers.**

60.     By falsely claiming that its EverestAir and Core Series purifiers had HEPA filters, and selling its replacement filters as HEPA, Defendant was able to overcharge Plaintiff and the class members in the amount of a HEPA-related premium associated with those claims.

61.     Defendant's HEPA claims appeared on the packaging that its Air Purifiers came in; appeared on the webpages where its products were sold; and were baked into the titles of the Air Purifiers themselves. Accordingly, those claims were seen by all purchasers of the Air Purifiers and replacement filters.

62.     Defendant's HEPA claims misled reasonable consumers.  Defendant is one of the nation's leading air-purifier manufacturers, so consumers would reasonably believe Defendant's HEPA claims; consumers do not and cannot typically test the accuracy of a HEPA claim before purchasing an air purifier; and Defendant's HEPA claims were expressly false, not impliedly false (Defendant explicitly claimed that Defendant's air purifiers and filters meet the HEPA standard, when in fact they do not), *i.e.*, no reasonable consumer would interpret Defendant's claims as making some kind of implicitly true statement.

63.     If Defendant hadn't claimed that its purifiers and filters were HEPA-grade, then the market price of those purifiers and filters would have been lower, *i.e.*, those market prices would have been less than they were in the actual world, and closer to the price of non-HEPA filters.

64.     Accordingly, Plaintiff and the proposed Classes paid for Defendant's Air Purifiers at artificially inflated prices.  In other words, Defendant's misrepresentations allowed it to overcharge Plaintiff and the Classes, who were damaged in the amount of that overcharge.

## CLASS ALLEGATIONS

65.     ***Class Definition***.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of himself and all other similarly situated consumers, and seeks to represent a class (the "Nationwide Class") defined as:

> All natural persons in the United States who purchased a Levoit Core 300, Core 300-RAC, Core 300S, P350, or EverestAir air purifier or replacement filter during the applicable statutory period.

66.     Plaintiff also seeks to represent a New York subclass defined as follows (the "New York Subclass"):

> All natural persons who purchased in New York a Levoit Core 300, Core 300-RAC, Core 300S, P350, or EverestAir air purifier or replacement filter during the applicable statutory period.

67.     The Nationwide Class and New York Subclass are collectively referred to as the "Classes."  Excluded from the Classes are governmental entities; Defendant; and Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

68.     Plaintiff reserves the right to modify or expand the definition of the Classes to seek recovery on behalf of additional persons as facts are learned in further investigation and discovery.

69.     ***Numerosity.***  Members of the Classes are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery of Defendant's records.  Class members may be notified of the pendency of this action by mail, email, publication, and/or other media, including social media.

70.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

a.   Whether the Products are in fact HEPA-grade;

b.   Whether Defendant's express representations about the capability of the Products included false and/or misleading statements and/or omissions;

c.   Whether Defendant knowingly made false HEPA claims about the Products;

d.   Whether Defendant's representations were material;

e.   Whether an objectively reasonable consumer would have been misled by Defendant's HEPA claims; and

f.  Whether Defendant's HEPA claims allowed it to charge more for the Products than it otherwise could have.

71.    *Typicality.*  Plaintiff's claims are typical of the claims of the proposed Classes because Plaintiff, like all members of the Classes, was induced by Defendant's false and misleading warranties to purchase Defendant's Products without knowing that Defendant's claims about the Products' filter were false and misleading.  The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendant's misconduct are common to Plaintiff and all members of the Classes and represent a common thread of misconduct resulting in injury to Plaintiff and all members of the Classes.

72.    *Adequacy*.  Plaintiff is an adequate representative of the Classes he seeks to represent because his interests do not conflict with the interests of the members of the Classes; he has retained counsel competent and experienced in prosecuting class actions; and he intends to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

73.    *Superiority*.  A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also represents a potential for inconsistent or contradictory judgments.  By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single

court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violations of New York's Deceptive Acts and Practices Law, GBL § 349
### (on behalf of Plaintiff and the New York Subclass)

74.    Plaintiff incorporates by reference paragraphs 1–73 of this Complaint as if fully stated herein.

75.    New York GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

76.    In its advertising and sale of goods throughout New York, Defendant conducts business and trade within the meaning of GBL § 349.

77.    As alleged in detail above, Defendant misrepresented material facts about its Products, including by misrepresenting to consumers that the Products had HEPA or "True HEPA" filters, despite knowing that they did not.

78.    Defendant, as manufacturer and marketer of the Products, was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had a greater purifying ability than they actually did.

79.    The facts misrepresented and/or concealed by Defendant were material in that Plaintiff and the members of the New York Subclass would have considered them in deciding whether to purchase the Products.

80.    As a result of these false and misleading practices, Defendant induced Plaintiff and the New York Subclass to purchase the Products that Plaintiff and members of the New York Subclass would not have purchased, or would have paid substantially less for, had Defendant been truthful about the quality and capability of its Products.

81.    Plaintiff and the New York Subclass seek injunctive and declaratory relief and full statutory damages to the full extent available under GBL § 349 and any other damages available under the law.

**COUNT II**
**Violations of New York's False Advertising Law, N.Y. GBL § 350**
**(on behalf of Plaintiff and the New York Subclass)**

82.    Plaintiff incorporates by reference paragraphs 1–73 of this Complaint as if fully stated herein.

83.    New York GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

84.    In its advertising and sale of goods throughout New York, Defendant conducts business and trade within the meaning of GBL § 350.

85.    Pursuant to GBL § 350, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

86.    As alleged in detail above, Defendant misrepresented material facts in its advertising about its Products, including on its packaging and in advertisements, including by misrepresenting to consumers that the Products had HEPA or "True HEPA" filters, despite knowing that they did not.

87.    Defendant, as manufacturer and marketer of the Products, was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had a greater purifying ability than they actually did.

88.    The facts misrepresented and/or concealed by Defendant were material in that Plaintiff and the members of the New York Subclass would have considered them in deciding whether to purchase the Products.

89.     As a result of these false and misleading practices, Defendant induced Plaintiff and the New York Subclass to purchase the Products that Plaintiff and members of the New York Subclass would not have purchased, or would have paid substantially less for, had Defendant been truthful about the quality and capability of its Products.

90.     Plaintiff and the New York Subclass seek injunctive and declaratory relief and full statutory damages to the full extent available under GBL § 350 and any other damages available under the law.

## COUNT III
### Fraud
**(on behalf of Plaintiff and the Nationwide Class or, in the alternative, the New York Subclass)**

91.     Plaintiff incorporates by reference paragraphs 1–73 of this Complaint as if fully stated herein.

92.     Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, in the alternative, the New York Subclass.

93.     As alleged in detail above, Defendant misrepresented material facts about the Products, including by misrepresenting to consumers that the Products had HEPA or "True HEPA" filters, despite knowing that they did not.

94.     Defendant was in a position to know (and did know) the true quality and capability of its Products, but it affirmatively warranted that the Products had HEPA filters, when in truth they did not.  In fact, Plaintiff is informed and believes that Defendant knew through its own testing—under IEST and EN1822 standards, which were in place at all times during the class period—that its Products were being falsely advertised as having HEPA filters.

95.     The misrepresentations made by Defendant, upon which Plaintiff and the members of the Classes relied, were intended to induce and actually did induce Plaintiff and the members of the Classes to purchase the Products.  Defendant induced Plaintiff and the members of the

24

Classes to purchase the Products that Plaintiff and the members of the Classes would not have purchased, or would have paid substantially less for, had Defendant been truthful about the quality and capability of its Products.

96.    Defendant's fraudulent actions caused damages to Plaintiff, the Nationwide Class, and the New York Subclass, who are entitled to damages and other legal and equitable relief as a result.

<strong><u>COUNT IV</u></strong><br><strong>Unjust Enrichment</strong><br><strong>(on behalf of Plaintiff and the Nationwide Class or, in the alternative, the New York Subclass)</strong>

97.    Plaintiff hereby incorporates by reference paragraphs 1–73 of this Complaint as if fully stated herein.

98.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, alternatively, the New York Subclass.

99.    As alleged in detail above, Defendant misrepresented material facts about its Products, including by misrepresenting to consumers that the Products had HEPA or "True HEPA" filters, despite knowing that they did not.

100.    Defendant was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had HEPA filters, when in truth they did not.

101.    Substantial benefits have been conferred on Defendant by Plaintiff and the Classes through the purchase of the Products.  Defendant knowingly and willingly accepted and enjoyed these benefits.

102.    Defendant either knew or should have known that the payments rendered by Plaintiff and the Classes were given and received with the expectation that the Products would contain true HEPA filters. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

103.    Defendant's acceptance and retention of these benefits of the payments from Plaintiff and the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and the Classes.

104.    Plaintiff and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

<u>**COUNT V**</u>
**Breach of Express Warranty**
**(on behalf of Plaintiff and the Nationwide Class or, in the alternative, the New York Subclass)**

105.    Plaintiff hereby incorporates by reference paragraphs 1-73 of this Complaint as if fully stated herein.

106.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, in the alternative, the New York Subclass.

107.    As alleged in detail above, Defendant provided Plaintiff and members of the Classes with an express warranty in the form of written affirmations of fact promising and representing that the Products had HEPA filters, including by misrepresenting to consumers that the Products had "HEPA," "H13," or "True HEPA" filters, despite knowing that they did not.

108.    These affirmations of fact became part of the basis of the bargain and were material to Plaintiff and the Class members' transactions.

109.    Plaintiff and members of the Classes reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts mispresented, omitted or concealed when they decided to buy Defendant's Products.

110.    Defendant was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had HEPA filters, when in truth they did not.

111.    Notice of Defendant's breach of warranty was sent to Defendant by letter dated March 6, 2024.

112.    Within a reasonable time after it knew or should have known, Defendant did not change the Products' labels, including after being put on notice of its breach by Plaintiff's letter.

113.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff and members of the Nationwide Class and New York Subclass were damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed Classes the following relief against Defendant:

(a)    An order certifying the Nationwide Class, and New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

(b)    An order declaring that Defendant's conduct violates the statutes and common law referenced herein;

(c)    Compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(d)    Prejudgment interest on all amounts awarded;

(e)    Restitution and all other forms of equitable monetary relief;

(f)    An order requiring Defendant to undertake a corrective advertising campaign;

(g)    An order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

(h)    Granting such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 5, 2024                    **GEORGE FELDMAN MCDONALD, PLLC**

By: */s/ Janine L. Pollack*
        Janine L. Pollack
Janine L. Pollack
Lori G. Feldman
745 Fifth Avenue, Suite 500
New York, NY 10151
Phone: (917) 983-2707
Fax: (888) 421-4173

27

Email : lfeldman@4-justice.com
Email: jpollack@4-justice.com
Email : Eservice@4-justice.com


**BURSOR & FISHER, P.A.**
L. Timothy Fisher
Luke Sironski-White
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         lsironski@bursor.com


**SINDERBRAND LAW GROUP, P.C.**
Greg Sinderbrand (State Bar No. 179586)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com


**GEORGE FELDMAN MCDONALD, PLLC**
David J. George
Brittany Sackrin
9897 Lake Worth Road, Suite 302
Lake Worth, Florida  33467
Phone: (561) 232-6002
Fax: (888) 421-4173
Email: DGeorge@4-justice.com
Email: BSackrin@4-justice.com
Email: EService@4-justice.com


**TAUS, CEBULASH & LANDAU, LLP**
Miles Greaves
Archana Tamoshunas
123 William Street
Suite 1900a
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
mgreaves@tcllaw.com
atamoshunas@tcllaw.com

**MIGLIACCIO & RATHOD LLP**
Jason Samual Rathod
Nicholas A. Migliaccio
412 H Street N.E.
Washington, DC 20002
(202) 470-3520
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

*Attorneys for Plaintiff*